# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-11234

Consolidated with 16-11708

United States Court of Appeals
Fifth Circuit

**FILED**
September 13, 2018

Lyle W. Cayce
Clerk

CONSTANCE WESTFALL,

  Plaintiff – Appellant,

v.

JOSE LUNA, Southlake Police Department Officer, In His Individual
Capacity; NATHANIEL ANDERSON, Southlake Police Department Officer,
In His Individual Capacity; VENESSA TREVINO, Southlake Police
Department Officer, In Her Individual Capacity; CHRIS MELTON,
Southlake Police Department Officer, In His Individual Capacity; THOMAS
ROBERSON, Southlake Police Department Officer, In His Individual
Capacity; CITY OF SOUTHLAKE,

  Defendants – Appellees.

---

Appeals from the United States District Court
for the Northern District of Texas

---

Before KING, ELROD, and GRAVES, Circuit Judges.

PER CURIAM:

  Police officers arrived at Constance Westfall's home at 2:00 a.m. to
investigate allegations made against her son of trespass into a neighbor's
home. What could have been a simple inquiry quickly escalated, resulting in
one officer entering Westfall's home, two officers forcing and holding her to the

No. 16-11234 c/w No. 16-11708

ground, and Westfall's arrest for interfering with the officers' public duties. Because we conclude that genuine fact issues exist as to whether certain of the officers' actions were objectively reasonable, we REVERSE and REMAND the district court's grant of summary judgment to Officers Nathaniel Anderson, Jose Luna, and Venessa Trevino on Westfall's false-arrest claims and to Luna on the excessive-force claim. We AFFIRM the district court's grant of summary judgment to Trevino on the excessive-force claim, to Luna on the retaliation claim, and to Anderson, Luna, and Trevino on Westfall's denial-of-medical-treatment claims. We also AFFIRM the district court's dismissal of Westfall's claims against Officers Chris Melton and Thomas Roberson, and failure-to-train claim against the City of Southlake. In addition, we DISMISS Westfall's appeal of the district court's sealing order for lack of jurisdiction.

I.

Facts and Procedural History

In the middle of the night in January 2014, the Southlake Police Department received a call reporting a trespass.[1] The call was from a young woman. She reported that two teenage boys, one later identified as A.A., had entered her home without permission. She told the boys that they did not have permission to be in the house, and the boys left and walked toward the house next door. The caller was the older sister of one of A.A.'s friends. According to the caller, the boys were looking for a marijuana grinder.

Shortly thereafter, Trevino and Anderson arrived at the house to which the boys had returned. The house belonged to Westfall and her husband, Monte Westfall. Anderson and Trevino knocked on the front door of the house,

---

[1] We view the evidence in the light most favorable to Westfall, as the party opposing summary judgment, and draw all reasonable inferences in her favor. *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) ("Our qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant . . . .")

2

and Westfall opened it.  Trevino identified herself, asked for A.A., and relayed the allegations against A.A.  Westfall responded by explaining that A.A. is her son and that his best friend lived in the house next door.  Trevino asked Westfall to go get her son.  Westfall went inside the house and closed the door because it was cold outside.  She began looking for her glasses, without which she is legally blind.

While Westfall was inside the house, the Southlake Police Department dispatcher called Westfall's home phone number.  Monte answered the call.  Monte believed it was a prank call and hung up the phone.  By this time, Luna had arrived at the Westfall residence and began knocking loudly on the front door.  The dispatcher called the house number again.  A.A. answered.  The dispatcher told A.A. to meet the officers outside.

A.A. and another teenage boy exited the house, with a third boy joining them soon afterwards.  Trevino and Anderson began questioning the three minor boys outside.  During the questioning, Trevino allegedly smelled marijuana on A.A.'s hands and asked the boys about the presence of marijuana. Then, Westfall exited the house, wearing boots and a coat over her nightgown.

While outside, Westfall complained about her inability to see the officers without her glasses and, in response to accusations that she had slammed the door in their faces, explained that she had only closed the door when the police first arrived because it was cold outside.  Following this exchange, the officers stopped addressing Westfall, despite repeated requests that they identify themselves, and continued to question the minor boys.

Monte brought Westfall her glasses.  Because it was cold, Westfall asked the officers to move inside of the house.  The officers declined.  Luna then asked Westfall to move to the side with him, so he could explain the situation to her.  Westfall declined, and Luna said that was okay but asked her to stop talking.

Westfall asked Luna why he was being so rude.  A short while later, when Westfall spoke in response to a question by Trevino directed at the boys, Luna again instructed Westfall to stop talking.

Eventually, the boys admitted to the officers that there was marijuana in the house.  After learning this from Anderson, Luna proclaimed that the officers could either wait for a search warrant or one of the boys could go into the house and retrieve the marijuana.  Addressing Monte, Anderson explained to him that there was marijuana in the house and that, with Monte's permission, the officers would go upstairs and confiscate it.  Anderson suggested that one of the boys take them upstairs.  Westfall then said, "[A.A.], go get it."  A.A. went inside of the house.  Anderson told Monte to also go inside, and Anderson followed him.

According to Westfall, Monte shut the door behind them.  As Westfall turned to follow them into her house, Luna approached her and told her, "You are not going anywhere.  You slammed the door in our face."  Westfall explained that she did not slam the door in his face, told Luna she was going into her house, and reached for the doorknob of the front door.  Then, Luna "body-slammed" Westfall to the ground.

Defendants describe a more dramatic exchange leading up to the body-slam.  According to Defendants, Westfall began to follow Anderson, Monte, and A.A. into her house when Anderson stopped her and told her she had to stay outside with the other officers.  Defendants claim that Westfall insisted on going inside, and Anderson replied that she was not going to "walk up on [him]" and that he had already given her instructions to stay outside.  Luna and Trevino asked Westfall to calm down and "get back over here."  According to Defendants, Westfall continued to protest, saying, "Let me go, I don't want you people to go up there," and "stop telling me to calm down."  Then, Westfall "began to pursue" Anderson into the home, approaching him from behind "at a

4

fast pace and in an aggressive manner." It was only then, according to Defendants, that Luna "brought [Westfall] to the ground."

Luna is 5'9" and weighs 175 pounds. Westfall is 5'5" and "has a small build." Westfall landed on the corner of the brick porch on her back. Luna and Trevino then held Westfall on the ground for about five minutes. During the time that Westfall was pinned, Anderson was in the house and retrieved a metal tin containing about 2.5 grams of marijuana from inside of the house.

Luna and Trevino handcuffed Westfall and placed her in a police car. After Westfall was handcuffed, Officers Chris Melton and Thomas Roberson arrived at the Westfall residence. While in the back of the police car, Westfall asked repeatedly for medical assistance. Roberson and Luna called for medical assistance shortly after 3:00 a.m., about thirty minutes after Luna slammed Westfall to the ground. About fifteen minutes later, medics arrived, and Roberson went with Westfall to a nearby hospital. In total, less than an hour elapsed between the time Westfall was pinned and the time she was taken to the hospital.

The hospital staff noted that Westfall had numerous abrasions and bruises, bloody urine, high blood pressure, and an increased heart rate. Westfall was released from the hospital, taken to the Keller Police Department, and released on bail later that morning. Westfall was charged with interference with public duties under Texas Penal Code section 38.15, though the charges were ultimately dropped. An MRI later revealed that Westfall suffers from a herniation to the L5-S1 level of her lumbar, for which Westfall has received therapy and injections and is currently contemplating surgery.

Westfall filed suit in federal court bringing claims for: (1) false arrest against all of the officers; (2) excessive force against Luna and Trevino; (3) First Amendment retaliation against Luna; (4) denial of medical treatment against all of the officers; and (5) failure to train against the City. Defendants filed a

No. 16-11234 c/w No. 16-11708

joint motion to dismiss the claims against Roberson, Melton, and the City and for summary judgment as to the other officers on the basis of qualified immunity.[2]  The district court granted the motion and dismissed the case. Westfall timely appealed.

## II.

## Standard of Review

We review the district court's resolution of legal issues on a motion for summary judgment on the basis of qualified immunity *de novo*.  *Hanks v. Rogers*, 853 F.3d 738, 743 (5th Cir. 2017).  "A qualified immunity defense alters the usual summary judgment burden of proof.  Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law."  *Id.* at 744 (citation omitted) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)).

---

[2] Westfall's appeal of the district court's order on this motion, No. 16-11708, is consolidated with an earlier appeal of the district court's grant of a motion to seal, No. 16-11234.  In support of their motion for summary judgment, Defendants moved to file under seal an "Internal Affairs Report" that contained the results of an investigation into the incident at issue by the Southlake Police Department.  The district court granted the motion, noting that Westfall did not confer with Defendants regarding the motion nor did Westfall respond to it.  Westfall filed a motion for reconsideration of the order and later filed a notice of appeal of the district court's order.  After Westfall filed the notice of appeal, Defendants provided Westfall with the report and filed a motion to unseal the report, which was granted.

We do not have jurisdiction over Westfall's appeal of the district court's sealing order. "Federal appellate courts have jurisdiction over appeals only from (1) a final decision under 28 U.S.C. § 1291; (2) a decision that is deemed final due to jurisprudential exception or that has been properly certified as final pursuant to Fed. R. Civ. P. 54(b); and (3) interlocutory orders that fall into specific classes, 28 U.S.C. § 1292(a), or that have been properly certified for appeal by the district court, 28 U.S.C. § 1292(b)."  *Askanase v. Livingwell, Inc.*, 981 F.2d 807, 809–10 (5th Cir. 1993).  Westfall focuses on the first and third categories.  But the court's order was not a final judgment.  *See* Fed. R. Civ. P. 54(b).  It is also not an interlocutory order that falls into a specific class that allows it to be appealed, *see* 28 U.S.C. § 1292(a), nor was it certified for appeal.  Consequently, we do not have jurisdiction over the appeal.  Furthermore, we agree with Defendants that, because the report has since been unsealed and provided to Westfall, Westfall's appeal of the order granting sealing is now moot.

No. 16-11234 c/w No. 16-11708

We review a district court's ruling on a motion to dismiss *de novo*, "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs." *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008)).    To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).    "[W]hen, as here, a qualified immunity defense is asserted in a . . . motion to dismiss, 'the district court must'—as always—do no more than determine whether the plaintiff has 'filed a short and plain statement of his complaint, a statement that rests on more than conclusions alone.'" *Anderson*, 845 F.3d at 589–90 (quoting *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995)).

"[A] plaintiff is required by his pleadings to state facts which, if proved, would defeat a claim of immunity." *Brown v. Glossip*, 878 F.2d 871, 874 (5th Cir. 1989).    "The purpose of requiring such allegations is, of course, to permit the trial court, and our court on review, if necessary, to implement a qualified immunity defense 'at the earliest possible stage of litigation.'"    *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987)).    As is well-established, "qualified immunity means immunity from having to stand trial, not simply immunity from monetary liability." *Id.*

III.

Analysis

The district court ruled in favor of Defendants on all of Westfall's claims. We reverse the district court's grant of summary judgment to Anderson, Luna, and Trevino on the false-arrest claims and to Luna on the excessive-force claim. We affirm as to the excessive-force claim against Trevino, the First

7

No. 16-11234 c/w No. 16-11708

Amendment retaliation claim against Luna, the denial-of-medical-treatment claims against all of the defendants, and the failure-to-train claim against the City.  Each claim will be discussed in turn.

*A. False Arrest*

"The right to be free from arrest without probable cause is a clearly established constitutional right." *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994).  A false-arrest claim requires a showing of no probable cause. *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001).  Probable cause exists "when the totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001).  "Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000).

Westfall was arrested for interference with a peace officer's public duties pursuant to section 38.15 of the Texas Penal Code.  "A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with . . . a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." Tex. Penal Code § 38.15(a)(1).  Under the statute, "[i]t is a defense . . . that the interruption, disruption, impediment, or interference alleged consisted of speech only." *Id.* § 38.15(d).  The statute thus criminalizes: (1) interference in some way that is beyond speech with (2) the performance of an officer's official duties.  *See Carney v. State*, 31 S.W.3d 392, 395–96 (Tex. App.—Austin 2000, no pet.).

No. 16-11234 c/w No. 16-11708

1.  Summary Judgment as to Anderson, Luna, and Trevino

The district court concluded that Anderson, Luna, and Trevino reasonably believed that they had probable cause to arrest Westfall for interfering with their duties.  With respect to the interference part of the offense, the district court relied on audio recordings taken by the officers on the morning in question.[3]  These recordings contain statements after Anderson tells Westfall to stay outside such as "I'll do what I want" and "Get off me" by Westfall; "You're not gonna walk up on me" by Anderson; and "You're going to be under arrest for interfering" and "You need to calm down" by Trevino.  The

---

[3] These recordings, submitted in support of Defendants' motion for summary judgment, were captured by microphones worn by Anderson, Luna, and Trevino.  Over Westfall's objection, the district court admitted the recordings as business records under Federal Rule of Evidence 803(6).  These recordings were the only evidence the district court considered.  This court reviews a district court's evidentiary rulings for abuse of discretion. *GE Capital Commercial, Inc. v. Worthington Nat'l Bank*, 754 F.3d 297, 302 (5th Cir. 2014). On appeal, Westfall argues that the recordings do not satisfy two of the requirements for the Rule 803(6) business-records exception: (1) that "the record was made at or near the time by—or from information transmitted by—someone with knowledge;" and (2) that "the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  Fed. R. Evid. 803(6).  First, Westfall points out that up to three-and-a-half hours passed between when the recordings were taken and when they were uploaded, which allowed time for alteration.  Second, Westfall identifies various inconsistencies in the time stamps for the recordings.

The district court did not abuse its discretion.  In *United States v. Hutson*, 821 F.2d 1015 (5th Cir. 1987), we held that printouts were sufficient to satisfy Rule 803(6) where they included both the date that a transaction took place as well as the date that the record was printed.  821 F.2d at 1020.  Here, there is an even stronger case, where the audio recordings, which include Westfall's voice, can only exist if they were taken at the time of the incident. Thus, the recordings were *made* at the time of the incident by someone with knowledge (the officers) even if they were uploaded or stored (like being printed) a few hours later. Furthermore, although Westfall pointed to some inconsistencies in the recordings, the district court did not abuse its discretion in concluding that they were trustworthy, given the short window of time between the recording and uploading and the possibility that the inconsistent time stamps resulted from technical error.  As a final point, the inaudible portions of the recordings are not so substantial as to render the recordings inadmissible. *See United States v. Chaney*, 299 F. App'x 447, 452 (5th Cir. 2008) ("This court reverses the admission of recordings on grounds of inaudibility only 'if the inaudible parts are so substantial as to make the rest more misleading than helpful.'" (quoting *United States v. Thompson*, 130 F.3d 676, 683 (5th Cir. 1997))).  The recordings were thus properly considered.

9

district court admitted that the recordings do not clarify whether Anderson's belief that Westfall presented a threat was reasonable, but nonetheless held that it was reasonable for Luna and Trevino to believe Westfall was a threat based on Anderson's statements and Westfall's responses.  The district court added that the audio demonstrated that Westfall resisted Luna and Trevino's efforts to restrain her.  As for Anderson, the district court held that it was reasonable for him to rely on Luna and Trevino's probable-cause determinations.

Regarding the officers' exercise of official duties, the district court held that, even if mistaken, it was "reasonable for [the officers] to believe they had [the] consent of both [Westfall] and her husband to enter the house."  The perceived consent from Westfall, in the district court's opinion, was her instruction to her son to "go get it" after Anderson's request to Monte to enter the house with one of the boys, and the perceived consent from Monte was Monte entering the house before Anderson without objection.

A reasonable officer could have concluded that Westfall's conduct was an unlawful interference.  It is true that arguing with officers does not constitute an actionable offense under section 38.15.  *See Carney v. State*, 31 S.W.3d 392, 396 (Tex. App.—Austin 2000, no pet.); *see also Freeman v. Gore*, 483 F.3d 404, 414 (5th Cir. 2007) (holding that a plaintiff's yelling and screaming at deputies about their right to search her home "alone does not take her conduct out of the realm of speech").  But failing to follow a deputy's instruction has been held to move beyond the realm of speech.  *See Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017) (holding that that plaintiff's conduct moved beyond speech where he failed to follow the deputy's instruction to move his truck).  Moreover, in the present case, Westfall not only failed to follow the officer's instruction not to enter the home, but also, based on her own account, acted contrary to that instruction when she reached for the doorknob of the front door.  A

reasonable officer could have concluded that Westfall's conduct constituted an interference that went beyond speech.

Fact issues remain, however, as to whether a reasonable officer could conclude that they were performing a duty or exercising lawful authority when they searched Westfall's home. The basis for consent argued by Defendants and found by the district court was Westfall's instruction to her son to "go get" the marijuana, after Anderson asked Monte for one of the boys to take the officers upstairs, and Monte's act of "leading" Anderson into the house.[4] Two issues remain regarding this consent: (1) whether a reasonable officer could conclude that the "knock and talk" nature of the encounter did not affect the consent that was allegedly given; and (2) whether a reasonable officer could conclude that any consent that was given was not revoked.

---

[4] In a letter submitted after oral argument pursuant to Rule 28(j) of the Federal Rules of Appellate Procedure, Defendants present for the first time the argument that the officers had lawful authority to enter Westfall's home without a warrant due to exigent circumstances. *See* May 10, 2018 28(j) at 2. Defendants justify the 28(j) letter by citing one of our recent unpublished opinions regarding the warrantless search of a car, *United States v. Beene*, No. 17-30383, 2018 WL 2068687 (5th Cir. May 2, 2018). This was not an appropriate use of a Rule 28(j) letter. The purpose of a Rule 28(j) letter is to advise the court of "pertinent and significant" authorities that come to a party's attention after the party's brief has been filed. Fed. R. App. P. 28(j). In addition, "[t]he letter must state the reasons for the supplemental citations, *referring either to the page of the brief or to a point argued orally*." *Id.* (emphasis added). Defendants' letter does not cite to new law pertinent to this case. *Beene* addresses the warrantless search of a car, not a home, and it thus did not alter our house-search case law. *See Beene*, 2018 WL 2068687, at \*5 ("Most of our exigency cases address warrantless house searches, not car searches. While these house-search cases supply general principles, they are not a great fit here given people's diminished expectation of privacy in cars."). Nor does the letter refer to any briefing or argument on exigent circumstances, because there is none. As a result, we do not consider Defendants' exigent-circumstances argument, which, in any event, appears to have been forfeited and lacking in merit.

In the same letter, Defendants also describe a request by Monte for the officers to search the home with a trained dog as consent. May 10, 2018 28(j) at 1-2. But this happened, even by Defendants' account, after Anderson had already entered the house and retrieved the marijuana. Monte's request therefore was not consent for the initial search.

The "knock and talk" nature of the officers' initial interaction with Westfall puts into question their ability to have obtained valid consent. We have recognized the knock-and-talk strategy as "a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001). We have held, however, that "[t]he purpose of a 'knock and talk' is not to create a show of force, nor to make demands on occupants, nor to raid a residence. Instead, the purpose . . . is to make investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search." *United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007), *overruled on other grounds by Kentucky v. King*, 563 U.S. 452 (2011). When no one answers the door despite knocking, "officers should . . . end[] the 'knock and talk' and change[] their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance." *Id.* at 356. Where officers continue an illegal search or seizure, any consent given after that fact is invalid, unless it was an independent act of free will. *Id.* at 357. This law was clearly established at the time of the officers' search of Westfall's home.

The officers' knock-and-talk conduct here, given the fact that they went to her home at 2:00 a.m., continued to knock on Westfall's door after she closed it, called her home repeatedly, looked through the windows of her home,[5] and walked around her property, even after she closed the door, may have been an unreasonable search that rendered any subsequent consent invalid. *See, e.g.*, *United States v. Hernandez*, 392 F. App'x 350, 351–53 (5th Cir. 2010) (holding that "[t]he district court should have acknowledged that the officers' knock-

---

[5] In one of the audio recordings, you hear Anderson ask Trevino if Westfall went and got back in bed because it appeared to him, presumably from looking through the windows of her house, that she returned to the same room she came from. A short while later, you hear the officers pounding on Westfall's front door.

and-talk conduct was an unreasonable search" and that there was no valid consent where the woman who allegedly gave consent did not initially answer the door, and the officers then circled her trailer, banged on doors and windows, shouted that they were present, and broke the glass pane of her door before she answered it).  If the district court determines that the officers' search was unreasonable for this reason, it would then need to consider whether Westfall's alleged consent was an independent act of free will.  *See, e.g.*, *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002) (outlining the three-factor test).  The district court did not consider this argument and should do so on remand.

Assuming *arguendo* that Westfall did give valid consent, taking the facts in the light most favorable to Westfall, her consent was withdrawn when she said she did not want the officers to go upstairs.  "[I]t is clearly established that 'a consent which waives Fourth Amendment rights may be limited, qualified, or withdrawn.'"  *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 426 (5th Cir. 2008) (quoting *United States v. Ho*, 94 F.3d 932, 936 n.5 (5th Cir. 1996)).  Here, Defendants once admitted that, before Westfall attempted to follow Anderson into the home, she protested and said, "I don't want you people to go up there."  This was sufficient to withdraw any perceived consent by Westfall.

After oral argument, Defendants changed their story and argued for the first time that  "[b]oth Appellant and Appellees incorrectly cite a transcription showing . . . Westfall revoked consent by stating 'I don't want you people to go up there.'"  May 10, 2018 28(j) at 2.  According to Defendants, "the actual audio recording does not reflect that statement in any way."  *Id.*  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  If a transcription could be created that includes Westfall saying she did not want the officers "to go up there," and Defendants could find it reliable enough

to quote it in their recitation of the facts, then surely a reasonable jury could conclude that Westfall said it.  Even assuming the recording is unclear on this point, Defendants' own briefing demonstrates that hearing this statement is at least one way to understand the recordings.  Furthermore, even if Monte's act of "leading" Anderson into the house could be construed as consent, any withdrawal of consent by Westfall would withdraw the consent of her co-occupant, Monte, as well.[6]  *See Gates*, 537 F.3d at 426 ("[A] physically present co-occupant may revoke or withdraw the consent given by another occupant."). Thus, a genuine fact issue remains on the reasonableness of an officer concluding that they had authority to enter the home based on consent.

Without any authority to conduct a search of Westfall's home, the officers lacked probable cause to arrest Westfall for interference with their official duties under section 38.15.  This was clearly established at the time of Westfall's arrest.  *See Freeman*, 483 F.3d at 414 (holding that a reasonable officer would have known that he could not lawfully search [the plaintiff's] home where officers did not have consent or a warrant). Because a fact issue exists as to the officers' authority, and because, viewing the facts in the light most favorable to Westfall, Anderson had the same information regarding consent as Luna and Trevino, who made the arrest, we reverse the district court's judgment on Westfall's false-arrest claims against Anderson, Luna, and Trevino.  *See Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995) (holding that bystander liability under § 1983 may be imposed on "an officer who is present

---

[6] Notably, the district court found that, as can be heard on the audio recordings, Anderson said to Monte, "Come on, sir.  I want you up here."  Then, Monte entered the house, followed by Westfall.  Even if Westfall had not revoked any consent given, Monte's silence and obedience could not reasonably be understood as consent.  *See Gates*, 537 F.3d at 420 ("[S]ilence or passivity cannot form the basis for consent to enter." (quoting *Roe v. Tex. Dep't of Protective & Regulatory Servs.*, 299 F.3d 395, 401 (5th Cir. 2002))); *see also United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996) ("It is well established that a defendant's mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent.").

at the scene and does not take reasonable measures to protect a suspect from another officer's [constitutional violations]").

### 2. Dismissal as to Melton and Roberson

Unlike Anderson, Melton and Roberson arrived after Westfall's arrest. The district court dismissed the false-arrest claims against Melton and Roberson, stating that Westfall failed to allege any facts that would support these claims. Westfall points to comments by each officer that show some knowledge of what took place that morning, such as a statement by Roberson to a medic that the officers "wrestled" with Westfall and a comment by Melton to Luna that Westfall was trying to enter her own residence. These statements, however, are not sufficient to show that either Melton or Roberson knew that the other officers did not have lawful authority to enter Westfall's home, as is required to establish bystander liability. *See Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (requiring for § 1983 liability under a theory of bystander liability that the officer "know[] that a fellow officer is violating an individual's constitutional rights" (quoting *Randell v. Prince George's Cty.*, 302 F.3d 188, 204 (4th Cir. 2002))). The district court properly dismissed Westfall's false-arrest claims against Melton and Roberson.

### B. Excessive Force

To establish a Fourth Amendment excessive-force claim, a plaintiff must "show that she suffered (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force was objectively unreasonable." *Flores v. Palacios*, 381 F.3d 385, 388 (5th Cir. 2003). Here, only the last element is at issue. Determining whether the force used was objectively unreasonable "requires careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether [she] is actively resisting arrest or

attempting to evade arrest by flight." *Trammel v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (quoting *Graham v. O'Connor*, 490 U.S. 386, 396 (1989)).

The district court accepted Westfall's allegations that Luna body-slammed her to the ground, that Westfall did not resist while on the ground, and that she was completely immobile underneath the weight of Luna and Trevino's bodies. Nonetheless, the district court concluded that Luna and Trevino acted reasonably and were simply "too forceful in bringing [Westfall] to the ground and . . . applied too much weight when restraining her on the ground." The district court supported its conclusion by noting that: (1) Westfall does not allege "the type of malicious force that is often alleged when a [c]ourt finds officers are not entitled to qualified immunity;" (2) that the force was "not unreasonable or unprovoked;" and (3) that Westfall's injuries were "consonant with officers reasonably attempting to restrain someone moderately resisting." But these are not the *Graham* factors. And proper application of the factors leads to a different result.

Applying the *Graham* factors to this case, Luna's use of force was objectively unreasonable. First, Westfall was arrested for interference with public duties—a minor offense. *See* Tex. Penal Code § 38.15(b) ("An offense under this section is a Class B misdemeanor."); *see also Trammell*, 868 F.3d at 340 (classifying a Class C misdemeanor as "a minor offense militating against the use of force"); *Reyes v. Bridgewater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010) (finding the "severity" *Graham* factor militated against use of force where the alleged crime was "at most a misdemeanor").

Second, taking the facts in the light most favorable to Westfall, no reasonable officer could conclude that Westfall posed a threat to Luna or the other officers by attempting to follow Anderson into her home. *See Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013) (holding that a reasonable officer could not have concluded that the plaintiff posed an immediate threat to the

safety of the officers by questioning their presence at his place of business, laying on the ground in handcuffs, or simply pulling his arm out of the officer's grasp).  Indeed, her size relative to Luna's reinforces this point.  The district court found that the audio contradicts Westfall's version of how the altercation began.  Yet, at the same time, the court admitted that the verbal exchanges in the audio do not settle whether it was reasonable for Anderson to think that Westfall was a threat.  And the court only concluded that it was reasonable for Luna and Trevino to believe that Westfall was a threat based on Anderson's statements and Westfall's response.  At a minimum, taking into consideration the audio recordings, a fact issue exists as to whether a reasonable officer in Luna or Trevino's position would have thought that Westfall posed an immediate threat to the officers.

Third, it is clear that Westfall was not trying to flee.  She was doing the opposite—trying to follow an officer into her house.  In addition, she was not yet under arrest.  Based on the district court's understanding of the audio, Trevino told Westfall that she was "gonna be under arrest for interfering" if she did not calm down, not that she was under arrest, before being slammed to the ground.

Even if she was not under arrest, "[o]fficers may consider a suspect's refusal to comply with instructions . . . in assessing whether physical force is needed to effectuate the suspect's compliance." *Darden v. City of Fort Worth*, 880 F.3d 722, 729 (5th Cir. 2018) (quoting *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009)).  "However, officers must assess not only the need for force, but also the relationship between the need and the amount of force used." *Id.* (quoting *Deville*, 567 F.3d at 167).  According to the district court, the audio makes it "clear that, at least initially, [Westfall] resisted . . . Luna and Trevino's efforts to restrain her," though the court accepted that the audio

17

could not disprove Westfall's allegation that she did not resist while on the ground.

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). The district court relied on *Scott* to disregard Westfall's account of the events leading up to the body-slam. But the standard is a demanding one: "a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden*, 880 F.3d at 730. In *Darden*, for example, we held that videos did not meet that difficult standard because they did not show what happened during an important twenty-five seconds of the encounter, a period of time for which the parties provided different accounts. *Id.* In *Ramirez v. Martinez*, 71 F.3d 369 (5th Cir. 2013), we held the same thing about videos that were "too uncertain" to discount the plaintiff's version of the events and where it was "unclear exactly what or who precipitate[d] and what constitute[d] that struggle." 71 F.3d at 374.

Here, the audio is similarly unhelpful. The audio does not indicate how, if at all, Westfall physically resisted the officers' alleged attempts to restrain her. Furthermore, the audio is unclear as to the sequence of events, including when exactly Luna slammed Westfall to the ground. Thus, there is a fact issue as to whether a reasonable officer would have concluded that there was a need for force. And taking the facts in the light most favorable to Westfall—that she was attempting to enter her house but not actively resisting the officers—a jury could reasonably find that the *degree* of force Luna used—slamming Westfall onto her brick porch—did not match the need. *See, e.g.*, *Trammell*, 868 F.3d at 342 (holding "that a reasonable jury could find that Trammel's

18

pulling his arms away from the officers," along with his refusal to cooperate with their instructions or answer their questions, "did not justify the officers' decision to tackle Trammel to the ground"); *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008) (holding that it was objectively unreasonable for an officer to slam an arrestee's face into a nearby vehicle when the arrestee "was not resisting or attempting to flee"); *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000) (holding that a fact issue existed as to the objective reasonableness of the officers tackling the plaintiff to the ground where he had pulled back his arm and stepped back after an officer grabbed it, there was no reasonable suspicion to detain him, and he was not fleeing).

Finally, the jury could view the severity of Westfall's injuries as evidence of excessive force. "In evaluating excessive force claims, courts may look to the seriousness of injury to determine whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction as is tantamount to a knowing willingness that it occur." *Deville*, 567 F.3d at 168 (quoting *Brown v. Lippard*, 472 F.3d 384, 386–87 (5th Cir. 2006)). The injury to Westfall's spine that allegedly resulted from this incident is serious and one that affects her daily life. We take that into consideration in determining that a reasonable officer would have known that Luna's use of force was unconstitutionally excessive.

When the arrest occurred, Westfall had a clearly established right to be free from excessive force, *Tarver v. City of Edna*, 410 F.3d 745, 753–54 (5th Cir. 2005), and it was clearly established that the permissible degree of force depends on the *Graham* factors, *Bush*, 513 F.3d at 502. Accordingly, we reverse the district court's grant of qualified immunity to Luna on Westfall's excessive-force claim.

Because "qualified immunity claims should be addressed separately for each individual defendant," *Darden*, 880 F.3d at 731 (quoting *Kitchen v. Dall.*

*Cty.*, 759 F.3d 468, 480 (5th Cir. 2014)), we now turn to Trevino.  According to Westfall, Trevino "added her body weight, 250 pounds, to fully immobilize [Westfall]."  "Although we no longer require 'significant injury' for excessive force claims, the injury must be more than *de minimis*."  *Tarver*, 410 F.3d at 752 (citation omitted).  This court has held the following types of injuries to be *de minimis*: abrasions, back and neck pain, and contusions.  *See Brooks v. City of W. Point, Miss.*, 639 F. App'x 986, 990 (5th Cir. 2016) (citing cases).  While Westfall's spinal injury is greater than a *de minimis* injury, the reasonable cause of that injury is Luna's body-slam and not Trevino's assistance in holding Westfall on the ground.  Westfall's other injuries, including the abrasions and bruises, bloody urine, and high blood pressure and heart rate, which may have been caused by Trevino's actions, are, based on our case law, *de minimis*.

Without an allegation of a greater than *de minimis* injury that was caused by Trevino assisting Luna in holding down Westfall, we affirm the district court's judgment granting qualified immunity to Trevino on this claim.

### C. Retaliation

To succeed on her First Amendment retaliation claim, Westfall must show that "(1) [she was] engaged in constitutionally protected activity, (2) the defendants' actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [her] exercise of constitutionally protected conduct."  *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

The district court focused on the last element of Westfall's First Amendment claim and concluded that Luna's restraint and arrest of Westfall were not motivated by her speech.  Westfall identified two statements in support of her First Amendment claim: (1) "Ma'am, Could you be quiet please? Or I am going to ask you to go back inside;" and (2) "Then I am going to ask

you to stop talking." Regarding these statements, the court held that these "alone do not a constitutional violation make."

Often times, the validity of a plaintiff's First Amendment claim hinges on probable cause for her arrest. *See Mesa v. Prejan,* 543 F.3d 264, 273 (5th Cir. 2008). "If [probable cause] exists, any argument that the arrestee's speech as opposed to her criminal conduct was the motivation for her arrest must fail, no matter how clearly that speech may be protected by the First Amendment." *Id.* Here, we have concluded that there is a fact issue on whether the officers had probable cause to arrest Westfall. Nonetheless, we affirm the district court's judgment granting qualified immunity to Luna on Westfall's First Amendment claim because she fails to establish that Luna's actions were substantially motivated by Westfall's speech and not her actions.

Taking the facts as Westfall presents them, she reached for the doorknob to her front door, in contravention of the officers' instructions, immediately before Luna used force against her. Moreover, Defendants' recitation of the facts involves Westfall approaching Anderson in a threatening manner. The record therefore does not support the conclusion that Luna's use of force or arrest of Westfall were "substantially motivated" by Westfall's speech. *See, e.g., Stephenson v. McClelland,* 632 F. App'x 177, 182–83 (5th Cir. 2015) (holding that "[t]he record [did] not support the conclusion that [the plaintiffs] were detained for asking too many questions or verbally opposing the officers" where they were instructed repeatedly to move away from an investigation scene, refused to comply, and continued to walk through the scene). Under either account, Luna was prompted by Westfall's attempt to enter the house, not her speech. Moreover, the identified comments by Luna were said before Anderson, Monte, and A.A. even entered the house. The district court properly granted summary judgment to Luna on Westfall's First Amendment claim.

*D. Denial of Medical Treatment*

Westfall alleges that her Eighth Amendment right to be free from cruel and unusual punishment was violated by each of the officers' refusal to provide her with immediate medical treatment in response to her complaints. "The appropriate standard to apply in analyzing constitutional challenges brought by pretrial detainees depends on whether the alleged unconstitutional conduct is a 'condition of confinement' or 'episodic act or omission.'" *Tamez v. Manthey*, 589 F.3d 764, 769 (5th Cir. 2009) (quoting *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)). The present challenge involves an "episodic act or omission" under our case law. *See Scott*, 114 F.3d at 53 (defining an "episodic act or omission" case as one "where the complained-of harm is a particular act or omission of one or more officials"); *see also Brown v. Strain*, 663 F.3d 245, 249 (5th Cir. 2011) (analyzing allegations that an officer refused to provide a detainee with immediate medical treatment as an "episodic act or omission" case).

For episodic act or omission cases, we apply the "deliberate indifference" standard. *Tamez*, 589 F.3d at 769. Under that standard, Westfall must show that each officer acted with subjective deliberate indifference to her need for medical care. *Id.* at 770. "A plaintiff can show deliberate indifference by showing that an official 'refused to treat [her], ignored [her] complaints, intentionally treated [her] incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 (5th Cir. 2017) (quoting *Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006)). "Delay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference that *results in substantial harm*." *Easter*, 467 F.3d at 464 (quoting *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993)). The pain

No. 16-11234 c/w No. 16-11708

suffered during the delay itself, however, can constitute a substantial harm and form the basis for an award of damages. *Alderson*, 848 F.3d at 422.

1. Summary Judgment as to Anderson, Luna, and Trevino

Anderson, Luna, and Trevino's actions in this case do not rise to the level of deliberate indifference. These officers did not refuse to treat Westfall, ignore her complaints, intentionally treat her incorrectly, or engage in any other conduct that would evince a wanton disregard for her medical needs. Roberson and Luna called for paramedics, who arrived less than 45 minutes after Luna brought Westfall to the ground. Although Westfall may have been in pain during that time, the officers' half-hour delay in calling for medical assistance does not clearly evince a wanton disregard for Westfall's medical needs. In addition, no substantial harm appears to have resulted from the delay. The only lasting injury suffered by Westfall is her spinal injury, which Westfall does not claim was impacted by a delay in receiving medical care. Indeed, Westfall claims that the treatment for her spinal injury thus far has simply been therapy and "two rounds of injections." As for the pain she endured during her wait for the paramedics, in her complaint, Westfall says only that she "was moaning in pain" while waiting in the back of the police car, without more details as to the severity of her pain. This is not substantial harm.

Because a reasonable officer could have believed that a delay of no more than 45 minutes for medical treatment, considering the injuries sustained by Westfall, was lawful under our clearly established law, the district court's judgment granting qualified immunity to Anderson, Luna, and Trevino on Westfall's denial of medical assistance claims is affirmed.

2. Dismissal as to Melton and Roberson

Westfall argues that she pleaded sufficient facts to support her denial-of-medical-treatment claims against Melton and Roberson. She points to the following in her pleadings: (1) Westfall's repeated requests for medical

23

assistance; (2) the delay in calling for paramedics; (3) Roberson refusing to admit that the other officers had thrown Westfall to the ground; and (4) Melton "allow[ing] Officer Luna to deny that Connie was injured and further delay calling the paramedics." As discussed above, however, Luna and Roberson's half-hour delay in calling for paramedics does not evince a wanton disregard for Westfall's medical needs, as is required to prove a claim for delay of medical care. With respect to the cause of her injuries, Melton and Roberson were not at the scene when Luna slammed her to the ground. They were therefore not in a position to confirm or deny claims as to how she was injured. Westfall also failed to plead any substantial harm that resulted from the officers' delay. Thus, dismissal of Westfall's denial-of-medical-treatment claims against Melton and Roberson was appropriate.

*E. Failure to Train*

Westfall brings a single claim against the City of Southlake. She alleges that the City had a practice of failing to train its officers. It is well-established that a municipality's failure to train its police officers can give rise to § 1983 liability. *World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 756 (5th Cir. 2009). "To prevail on a 'failure to train theory' a plaintiff must demonstrate: (1) that the municipality's training procedures were inadequate, (2) that the municipality was deliberately indifferent in adopting its training policy, and (3) that the inadequate training policy directly caused the violations in question." *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 170 (5th Cir. 2010). In addition, "a plaintiff must allege with specificity how a particular training program is defective." *Id.* (quoting *Roberts v. City of Shreveport*, 297 F.2d 287, 293 (5th Cir. 2005)).

Proof of deliberate indifference "generally requires a showing 'of more than a single instance of the lack of training or supervision causing a violation of constitutional rights.'" *Burge v. St. Tammany Par.*, 336 F.3d 363, 370 (5th

Cir. 2003) (quoting *Thompson v. Upshur County*, 245 F.3d 447, 459 (5th Cir. 2001)). "Rather, deliberate indifference generally requires that a plaintiff demonstrate 'at least a pattern of similar violations' arising from training that is so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Id.* (quoting *Thompson*, 245 F.3d at 459). A narrow single-incident exception exists only "where the facts giving rise to the violation are such that it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy or failure to train." *Id.* at 373.

Westfall argues that this case fits within the narrow single-incident exception. We disagree. Westfall likens this case to *Grandstaff v. Borger*, 767 F.2d 161 (5th Cir. 1985), in which we sustained the § 1983 liability of the City of Borger, Texas, where the evidence established repeated acts of abuse by several officers in several episodes over the course of one night, tending to prove a disposition to disregard human life and safety so prevalent as to be policy or custom. *Grandstaff*, however, is easily distinguishable. The level of abuse in *Grandstaff*, where multiple officers were "quick to fire on the highway at [the suspect]" and "recklessly killed" an innocent third party, was far more egregious than what is present here—a potentially illegal search and excessive force when bringing someone to the ground. 767 F.2d at 167, 171. Moreover, as discussed above, only three of the five officers present that morning were involved in potential violations of Westfall's rights. Without facts to support a finding of deliberate indifference on the part of the City, we affirm the district court's dismissal of Westfall's failure to train claim.[7]

---

[7] Westfall points to the City's initial actions of denying wrongdoing to demonstrate a disposition to disregard human life and safety so prevalent as to be police policy or custom. Indeed, in *Grandstaff*, the disposition of the policymaker was inferred from his conduct after the events of that night, such as the fact that there were no reprimands, no discharges, and no admissions of error. 767 F.2d at 171. But the episode in *Grandstaff*, involving gunfire

No. 16-11234 c/w No. 16-11708

IV.

Conclusion

For the foregoing reasons, we REVERSE the district court's grant of summary judgment to Anderson, Luna, and Trevino on Westfall's false-arrest claims and to Luna on the excessive-force claim; we AFFIRM the district court's grant of summary judgment to Trevino on the excessive-force claim, to Luna on the First Amendment retaliation claim, and to Anderson, Luna, and Trevino on Westfall's denial-of-medical-treatment claims; and we AFFIRM the district court's dismissal of Westfall's claims against Melton, Roberson, and the City. Westfall's appeal of the district court's sealing order is DISMISSED for lack of jurisdiction. This is case is REMANDED for further proceedings consistent with this opinion.

---

and the death of an innocent person, was one of "dangerous recklessness" that demanded greater attention from the city. *Id.* Here, only Luna's conduct could be considered dangerous. And while we do not condone his use of force, we also need not make the same inference as the *Grandstaff* court regarding the city's policy based on the lack of discipline that resulted.

26