# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
March 13, 2012

Lyle W. Cayce
Clerk

No. 10-20422

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

STEVEN COOKE,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and HIGGINSON, Circuit Judges.
JERRY E. SMITH, Circuit Judge:

Steven Cooke pleaded guilty of being a felon in possession of stolen fire-arms and body armor in violation of 18 U.S.C. §§ 922(g) and 931(a)(2), respectively. His plea was subject to an appeal of the denial of his motion to suppress evidence, namely, the guns and armor discovered during a search of his house. Cooke alleges that the police unlawfully entered the curtilage while attempting

No. 10-20422

to conduct a "knock and talk" in violation of the Fourth Amendment and that his mother's consent to enter the premises was vitiated by his prior express refusal under *Georgia v. Randolph*, 547 U.S. 103 (2006), even though his mother, but not Cooke, was at the house. We affirm.

## I.

Cooke was arrested in Polk County after suspicious activity was reported at a motel. While searching his truck and motel room, officers found two weapons, a digital camera with memory cards, ammunition, and a trace of methamphetamine. The camera had pictures showing Cooke holding firearms other than those found. Two Secret Service agents, suspecting Cooke was counterfeiting money, asked to search his residence in Tomball, Texas (Harris County). He refused.

A week after Cooke's arrest and while he was still in jail, Secret Service, ATF, and local law enforcement agents visited the residence to conduct a "knock and talk." The residence is unique, located at the corner of two residential streets, with a fence separating the property from neighbors, but no fence along the two street-sides. Aside from the residence, the property has several trees and a large driveway separating the residence from the street by about fifty feet. The exterior is windowless and resembles a barn or warehouse. The front and back each have two, large sliding exterior barn doors, with a security camera above the front doors. Inside the structure is a large area with a dirt floor, save for a paved sidewalk path that leads to a stoop and another set of doors. Inside the second set of interior doors are living quarters where Cooke, his wife, and his mother resided.

When agents approached, they noticed that one of the exterior barn doors had been damaged by a hurricane, leaving an opening through which one could walk directly into the residence. The agents also claim that the second barn door

No. 10-20422

was "wide open" such that they could see through the entire residence, similar to a "carport," because the rear barn doors were also open. Cooke claims that the intact front barn door was closed. Believing that knocking on the exterior barn doors would be futile, the agents walked through the open barn door and knocked on the interior set of doors. After about a minute of knocking and announcing, Ima Cooke ("Ima"), Cooke's 78-year old mother, came to the door, asked the officers what they wanted, and after a brief conversation explaining that they wanted to enter the residence and ask questions, allowed them into the living quarters.

While speaking with Ima, one agent saw a shotgun shell and gun safe lying in plain view and, based on that information, the officers eventually secured a search warrant. In the safe they found numerous firearms, ammunition, and a bulletproof vest.

## II.

In the district court, Cooke moved to suppress the evidence on the ground that the agents unlawfully entered the curtilage of his residence when they conducted the knock and talk, that Ima's consent was not voluntary, and that his refusal of consent trumped Ima's consent. The district court denied the motions, and Cooke pleaded guilty, reserving his right to appeal the suppression motions in his plea agreement. Cooke now renews his contentions that agents unlawfully entered the curtilage and that his refusal of consent trumps his mother's consent. He does not appeal the ruling that Ima's consent was voluntary.

## III.

In the context of Fourth Amendment suppression issues, this court reviews questions of law *de novo* and questions of fact for clear error. *United States v. Gonzalez*, 328 F.3d 755, 758 (5th Cir. 2003). We view evidence presented at the

No. 10-20422

suppression hearing in the light most favorable to the prevailing party (here, the government). *Id*. Thus, we "should uphold the district court's ruling to deny the suppression motion if there is any reasonable view of the evidence to support it." *United States v. Michelletti*, 13 F.3d 838, 841 (5th Cir. 1994) (en banc) (internal quotation marks and citations omitted).

Cooke contends that law enforcement unlawfully entered the curtilage of the house when they crossed the barndoor threshold without a warrant or consent. Those actions, he argues, led to the discovery of the unlawfully possessed firearms and body armor, which, as fruit of the poisonous tree, should be suppressed. The government asserts that the area between the two sets of doors was not part of the curtilage, so Cooke's rights were not violated when the officers entered to knock on the interior set of doors.

The parties agree that the touchstone case for determining what part of a residence is "curtilage" is *United States v. Dunn*, 480 U.S. 294 (1987), which laid out a four-factor test: (1) the proximity of the area claimed to be curtilage to the house, (2) whether the area is included within an enclosure surrounding the house, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id*. at 301. This test does not mechanically answer all curtilage questions, but rather, "these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id*.

The first *Dunn* factor weighs in favor of Cooke, as the government concedes, because the area in question was physically attached to, and shared the same roof as, the residence. The second factor also supports Cooke: The area that he claims to be curtilage was surrounded by the walls of the structure, which completely surround the residence. Although no fence completely sur-

4

rounds the structure (the only fence on the property was on two sides), the walls and barn doors around the area in question practically functioned as a fence: One is required to pass through the barn doors and into the area in question to reach the front door of the living quarters.

The third factor supports the government's position:  The area had a dirt floor, had a paved pathway leading to the interior doors, and seems to have been used as storage.  Finally, the fourth factor also tends to support the government: Although the barn doors could be closed, completely obstructing the public's view, at least one barn door was broken, and government agents testified that both the front and rear doors were "wide open."  The district court seemed to credit the government's account, describing the area as "akin to a covered porch" into which "any member of the public would have gone to knock at the defendant's front door."

Given the peculiarities of the residence, it is not surprising that the four *Dunn* factors do not provide dispositive guidance as to whether the area immediately inside the barn doors is curtilage.  But the central aim of *Dunn* is determining whether the area in question "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life" such that the area is "so intimately tied to the home itself that it should be placed under the home's umbrella of Fourth Amendment protection."  *Id.* at 300-01 (internal quotation marks and citations omitted).

Cooke relies on several facts that demonstrate the privacy and intimacy of the area.  He notes that a security camera pointed to the driveway, meaning that the officers should have been on alert that the interior of the structure was a private space and that the occupants would be able to see them without the officers' having to enter the barn doors. The agents claim not to have noticed the security camera.  Cooke also points to a sign posted on the interior set of doors that should have warned officers that only invitees were allowed on the prem-

ises.[1]  But, the officers could see that sign only after they had entered through the barn doors, and the sign could be read to apply only to the living quarters and not necessarily to the area in question.

The government and district court point to three facts of their own that show the area was not a private or intimate space.  First, the area had a dirt floor and a paved sidewalk that leads to the interior door.  Second, the contents of the area included such things as nonoperating washing machines and dryers, ladders, a grill, and other sundry items one would expect to find in a storage area or yard.  Finally, and perhaps most importantly, the government contends, and the court agreed, that the doors of the area were open wide enough such that the items stored there were exposed to the elements, the public could see into the area from the street, and any member of the public would reasonably think that they would have to enter and knock on the interior doors when visiting.[2]

This last fact is especially important in light of *United States v. Thomas*, 120 F.3d 564 (5th Cir. 1997).  Because Cooke's residence is so idiosyncratic and this court's caselaw on curtilage so sparse, no case from this circuit is on point or closely analogous.  But *Thomas* provides guidance.  There, the police, who suspected marihuana in an apartment, walked past an open gate of a privacy fence that surrounded the apartment to knock on the door and obtain consent to search.  *Id.* at 586.  The defendants argued that the area enclosed by the fence was part of the curtilage, so their Fourth Amendment rights were violated when

---

[1] The sign read: "Attention: Number one, what you see here, hear here, do here stays here when you leave here; number two, remember, you are here only because you are/were invited here; number three, there will be absolutely no 911 calls made from this address for any reason, not for you and not for me, period.  This is not a joke.  Choices made; consequences paid.  SS."

[2] Additionally, the agents testified that, because of the large amount of noise coming from neighboring properties reconstructing after the hurricane, they reasoned that any occupants of the Cooke residence would have been unable to hear knocks on or announcements from the outer barn door.

No. 10-20422

the police entered it without a warrant. *Id.* at 571. As here, the court in *Thomas* determined that the first two *Dunn* factors weighed in favor of the defendants, the latter two in favor of the government. *Id.* We ruled in favor of the government based on the district court's finding that, because the gate had no bell or knocker, "it was certainly reasonable for the officers to believe the front door was readily accessible to the general public; and it was the principal means of access to the dwelling." *Id.* at 571-72 (internal quotation marks omitted).

Similarly, the outside barn doors of Cooke's residence had no bell or knocker. Although a security camera monitored the outside of the building, the officers, even if they had seen the camera, had no reason to believe that someone inside the residence was constantly watching the video feed such that they would be aware of the officers' desire to speak and enter. In congruence with these facts, the district court described the area as a "covered porch," a finding that, based on the evidence, is not clearly erroneous.

Accordingly, as in *Thomas*, members of the public would reasonably believe they had to enter the first threshold of the building to knock on the interior set of doors to obtain the attention of the residents and access the dwelling. The space entered by the police without consent or a warrant was thus not one that "harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." *Dunn*, 480 U.S. at 300 (internal quotation marks and citations omitted). These findings, coupled with the fact that we view the evidence in the light most favorable to the government, lead us to conclude that the area inside the first set of barn doors but outside the interior doors was not part of the curtilage, so the police did not violate Cooke's Fourth Amendment rights by entering the area without consent or a warrant.

Alternatively, even if the officers had unlawfully entered the curtilage, any such violation was attenuated by Ima's voluntary consent, which broke the chain of causation between the alleged violation and discovery of the evidence. *See*

No. 10-20422

*Brown v. Illinois,* 422 U.S. 590, 603-04 (1975); *United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998). Although the taint of violation was not cured by a long passage of time between Ima's consent and the alleged violation or by other intervening circumstances, *see United States v. Chavez-Villarreal*, 3 F.3d 124, 128 (5th Cir. 1993), those facts alone are not dispositive in a *Brown* analysis, *see United States v. Sheppard*, 901 F.2d 1230, 1235 (5th Cir. 1990).

Rather, what is most important in determining whether the violation was attenuated is "the purpose and flagrancy" of the violation that led to the discovery of the evidence. *Brown*, 422 U.S. at 604; *Sheppard*, 901 F.2d at 1235. Given that the purpose of entering through the barn door was to conduct a "knock and talk" (a common and legitimate police practice) and that the curtilage issue in this case is difficult and nuanced, any violation is technical at best and certainly not flagrant. Nor did the police use coercive or deceptive tactics on Ima or fail adequately to inform her of her rights in an attempt to take advantage of the alleged violation. *See United States v. Kelley*, 981 F.2d 1464, 1471 (5th Cir. 1993); *United States v. Richard*, 994 F.2d 244, 252 (5th Cir. 1993). Thus, Ima's consent attenuated any alleged Fourth Amendment violation in entering through the outside doors such that the causal chain between the alleged violation and the discovery of the evidence is broken.[3]

_____

[3] *Sheppard* is probably most analogous. There, the court addressed a Fourth Amendment claim that arose when a Border Patrol checkpoint agent leaned his head into a car window to get a good look into the driver's eyes and, as a result, noticed that the driver's eyes were bloodshot and smelt burnt marihuana in the car. The defendant later consented to a search of the car. In determining that Sheppard's consent broke the causal chain of any possible violation committed by the officer's sticking his head through the window, this court stated:

> While not determining whether the challenged conduct constituted an illegal search, we conclude that the brief intrusion into the Cadillac to establish eye contact with its occupants to gauge the veracity or evasiveness of their responses to citizenship inquiries was not at all flagrant, but was at worst a most minor and technical invasion of Sheppard's rights. Even though the time span between the challenged conduct and Sheppard's consent was short, we

(continued...)

8

No. 10-20422

IV.

The question remains, however, whether Ima's consent to entry was valid or instead was vitiated by Cooke's express refusal to consent while he was in jail in another county. Cooke argues that under *Georgia v. Randolph*, 547 U.S. 103 (2006), the warrantless search was invalid because Ima's consent is trumped by his refusal to consent. In *Randolph*, the Court addressed a suppression claim where an estranged wife gave consent to search the marital home for drugs after the defendant, who was also present at the door, refused consent. The Court held that, although co-tenants generally have the ability to consent to search, "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id.* at 122-23. Cooke asks this court to extend *Randolph* to his situation, where a physically *absent* tenant refuses to give consent while a physically *present* cotenant grants consent.

The Court in *Randolph* arrived at this rule by examining the "widely shared social expectations" that inform a Fourth Amendment "reasonableness" analysis. *Id.* at 111. Thus, the Court explained,

> [Cotenants] understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another. As *Matlock* put it, shared tenancy is understood to include an "assumption of risk," on which police officers are entitled to rely . . . . [But] it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, "stay out."

---

[3] (...continued)
cannot find that the second search resulted from the exploitation of the challenged conduct. Sheppard's voluntary consent to the search of the Cadillac served to attenuate the connection between the alleged misconduct and the discovery of the contraband.

*Sheppard*, 901 F.2d at 1235 (footnotes omitted).

9

No. 10-20422

> Without some very good reason, no sensible person would go inside under those conditions. . . . In sum, there is no common understanding that one co-tenant generally has a right or authority to prevail over the express wishes of another, whether the issue is the color of the curtains or invitations to outsiders.

*Id.* at 111-14.

The Court also took pains to distinguish its two principal cases upholding searches based on a cotenant's consent. In *United States v. Matlock*, 415 U.S. 164 (1974), the defendant was arrested in the front yard of the house in which he lived and was detained in a squad car nearby. A cotenant granted permission to search, and the Court upheld the constitutionality of that search. Similarly, in *Illinois v. Rodriguez*, 497 U.S. 177 (1990), the Court upheld a search of the defendant's residence when his cotenant consented and he was asleep in a nearby room. The *Randolph* Court, 547 U.S. at 121, explained that the "customary social understanding" is that entrance into a home is generally permitted when invited by a cotenant even if there is an absent, nonconsenting resident, but a cotenant's authority to consent is not powerful enough to prevail over the objection of a physically present fellow tenant. Nor did the police have a duty to head over to the squad car to ask Matlock for his consent or rouse Rodriguez from his slumber to give him the opportunity to object. *Id.*

The Court thus expressly preserved *Matlock* and *Rodriguez*, "drawing a fine line": "[I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Id.* This rule, the Court explained, recognizes "the co-tenant's permission when there is no fellow occupant on hand, [but] accord[s] dispositive weight to the fellow occupant's contrary indication when he expresses it." *Id.* at 121-22.

No. 10-20422

In contrast to the defendant in *Randolph*, Cooke was not a "present and objecting" cotenant but rather was many miles away from his home in jail when he objected to the search. Neither the Supreme Court nor this court has directly addressed the situation of whether an absent defendant's objection vitiates the consent of a physically present cotenant. Several sister circuits, however, have spoken: The Seventh and Eighth Circuits have permitted searches under similar circumstances; the Ninth Circuit has invalidated such searches.

The Eighth Circuit squarely addressed the question of *Randolph*'s applicability to an absent, objecting cotenant in *United States v. Hudspeth*, 518 F.3d 954 (8th Cir. 2008) (en banc). Hudspeth, who had been arrested after child pornography was found on his work computer, refused to consent to a search of his home computer. When officers arrived at his house, Hudspeth's wife (who was unaware of his refusal) consented to the search of their home computer, which uncovered more child pornography and surreptitiously-taken videos of his naked stepdaughter.

In upholding the legality of the search, the Eighth Circuit ruled that *Randolph* was not applicable, because the *Randolph* Court consistently and repeatedly noted that what distinguished *Randolph* from cases such as *Matlock* and *Rodriguez* was "Randolph's *physical presence* and *immediate objection* to Mrs. Randolph's consent." *Id.* at 959. *Randolph* was a narrow exception to the general *Matlock* rule permitting cotenant consent, relevant only as to physically present objectors. *Id.* at 959, 960-61. When officers are invited in by a physically present tenant, no "social custom" would counsel not to enter, even if an absent cotenant had previously refused admittance, because "the absent, expressly objecting co-inhabitant has 'assumed the risk' that another co-inhabitant 'might permit the common area to be searched.'" *Id.* at 960-61 (quoting *Matlock*, 415 U.S. at 171 n.7). Thus, under the totality of the circumstances, the Eighth Circuit ruled that the search of Hudspeth's computer was reasonable.

11

*Id.* at 961.

The Seventh Circuit addressed a similar situation in *United States v. Reed*, 539 F.3d 595 (7th Cir. 2008), and also concluded that *Randolph* was inapposite because it was a narrow decision that applies only where a cotenant is present and objecting or is arrested for the purpose of removing the defendant from the area to prevent any effective objection to search. *Id.* at 598-99. The Seventh Circuit faced a different situation that posed an arguably closer question in *United States v. Henderson*, 536 F.3d 776 (7th Cir. 2008), in which the defendant forcefully ordered officers out of his house and was then arrested for domestic battery, after which the officers received consent from his wife to search for drugs. Nevertheless, the court upheld the search because "*Randolph* left the bulk of third-party consent law in place; its holding applies only when the defendant is both present and objects to the search of his home." *Id.* at 777.

In arriving at this narrow interpretation of *Randolph*, the Seventh Circuit noted that Justice Breyer, who provided a fifth vote in *Randolph* and wrote a concurrence, intimated that, had Randolph not been physically present, the result would have changed significantly, and thus "Justice Breyer's concurrence declared the outer limits of the Court's holding: 'The Court's opinion does not apply where the objector is not present and objecting.'" *Id.* at 781 (quoting *Randolph*, 547 U.S. at 126 (Breyer, J., concurring)). Agreeing with the Eighth Circuit, the court also noted that beyond the mere textual terms of *Randolph*, this result is supported by *Randolph*'s societal expectations rationale: "[The absent tenant's] objection loses its force because he is not there to enforce it, or perhaps . . . because the affront to his authority to assert or waive his privacy interest is no longer an issue." *Id.* at 783-84. Finally, the court reasoned that the opposite result would mean that "a one-time objection by one is sufficient to permanently disable the other from *ever* validly consenting to a search of their shared premises." *Id.* at 783.

No. 10-20422

In contrast, the Ninth Circuit has invalidated, under *Randolph,* warrant-less searches where an absent cotenant objects. In *United States v. Murphy*, 516 F.3d 1117 (9th Cir. 2008), Murphy was allowed to live in storage units rented by Roper. Police, after observing the manufacture of methamphetamine in plain view, arrested Murphy and asked for his consent to search the storage unit, which he refused. Consent was later obtained from Roper. *Id.* at 1119-20.

The Ninth Circuit invalidated the search and held that "when a co-tenant objects to a search and another party with common authority subsequently gives consent to that search in the absence of the first co-tenant the search is invalid as to the objecting co-tenant." *Id.* at 1124. If, under *Randolph*, 547 U.S. at 121, suspects cannot be removed from the scene for the purpose of preventing an objection to a search, then "surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made." *Murphy*, 516 F.3d at 1124-25. Find-ing no reason not to extend *Randolph* even more broadly (but also not providing an affirmative reason to extend it), the court also refused to "limit the *Randolph* rule to an objecting tenant's removal by police." *Id.* at 1125. Thus, "[o]nce a co-tenant has registered his objection, his refusal to grant consent remains effective barring some objective manifestation that he has changed his position and no longer objects." *Id.*

We agree with the Seventh and Eighth Circuits that the objection of an absent cotenant does not vitiate the consent of a physically present cotenant under *Randolph*. First, as both courts noted, *Randolph* self-consciously empha-sized the importance of Randolph's presence by repeatedly noting it when declar-ing and reiterating the holding. *See Randolph*, 547 U.S. at 106, 114, 121, 122, 123. Justice Breyer's concurrence confirms the importance of physical presence. *Id.* at 126 (Breyer, J., concurring). Second, the *Randolph* Court seemed to have structured the holding as an exception to the general rule of *Rodriguez* and *Mat-lock* that a cotenant may consent to the search of a residence, *id.* at 106, and that

13

this exception was narrowly drawn along a "fine line." *Id.* at 121-22. Third, although it is a close question, social convention normally allows for a visitor to feel invited into a home when invited by a physically-present resident, even if an absent cotenant objects to it, rather than the visitor's assuming he is *verboten* forever until the objector consents.[4]

In sum, *Randolph* applies only to searches conducted in the face of a present and objecting cotenant. The district court did not err in denying Cooke's motion to suppress. Cooke's conviction and sentence are AFFIRMED.

---

[4] Indeed, there is an "assumption of risk" of odious persons inside the home when one chooses to live with another and, at times, leave the residence. *Randolph*, 547 U.S. at 111 ("[Cotenants] understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another.").

14