# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 12, 2022

Lyle W. Cayce
Clerk

No. 21-10159

Constance Westfall,

*Plaintiff—Appellant*,

*versus*

Jose Luna, Southlake Police Department Officer, In His Individual Capacity; Nathaniel Anderson, Southlake Police Department Officer, In His Individual Capacity; Venessa Trevino, Southlake Police Department Officer, In Her Individual Capacity,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Northern District of Texas
No. 4:15-CV-874

Before Dennis, Southwick, and Wilson, *Circuit Judges*.

Per Curiam:*

Treating the petition for rehearing en banc as a petition for panel rehearing, the petition for panel rehearing is GRANTED. *See* 5th Cir. R.

---

* Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-10159

35 I.O.P.  Because no member of the panel or judge in regular active service requested that the court be polled on rehearing en banc, the petition for rehearing en banc is DENIED.  *See* FED. R. APP. P. 35; 5TH CIR. R. 35.  Our prior panel opinion, *Westfall v. Luna*, No. 21-10159, 2022 WL 797410 (5th Cir. Mar. 15, 2022) (unpublished), is WITHDRAWN and the following opinion is SUBSTITUTED therefor:

Following a dispute between Southlake Police Department (the "Department") officers and the Westfall family at the Westfall's residence, Constance Westfall ("Constance" or "Westfall") filed suit in the Northern District of Texas, bringing claims against several defendants connected with the Department.  The district court initially granted summary judgment in favor of all defendants on all claims and determined that Officers Trevino, Anderson, and Luna, the defendants at issue in this appeal, were entitled to qualified immunity.  However, on appeal this court remanded Westfall's claims against Trevino, Anderson, and Luna to the district court for trial, holding that there existed three genuine disputes of material fact which precluded summary judgment, including, as relevant here, whether a reasonable officer could conclude that the "'knock and talk'" nature of the encounter affected the consent that was allegedly given.  *Westfall v. Luna*, 903 F.3d 534, 545 (5th Cir. 2018) (*Westfall I*).  Accordingly, on remand, the parties tried their case before a jury.  After presentation of evidence and argument, the jury found that none of the defendants had violated the Constitution in any of the manners alleged by Westfall.  Westfall filed a motion for judgment as a matter of law and a motion for new trial.  The district court denied those motions, reasoning that legally sufficient evidence existed to support the jury's verdict and that Westfall failed to show that any harmful error had occurred which would entitle her to a new trial.  Westfall now appeals.

No. 21-10159

## I. Background

At approximately 1:54 a.m. on January 11, 2014, the Southlake Police Department received a call reporting a trespass. Officer Trevino responded and was told by the complainant that two teenage boys, including a boy identified by name who lived next door ("WW"), had entered her home without permission. The complainant said that the boy had been looking for a "grinder," which Trevino understood to mean a marijuana grinder. The complainant's boyfriend told Trevino that the boys went into a residence next door (the "Westfall residence"). While waiting for backup, Trevino observed multiple juveniles in a lit room upstairs in the Westfall residence. Officer Anderson arrived shortly after and was briefed by Trevino about the juveniles seen in the Westfall residence.

At approximately 2:15 a.m., Trevino and Anderson knocked on the front door of the Westfall residence. Constance Westfall ("Constance" or "Westfall") opened the door. Trevino identified herself and disclosed that WW entered someone's house without permission. Constance responded that she had been asleep, explained that WW was her son, and asked what the Officers wanted from him. Anderson asked Constance to check if WW was home. Constance nodded her head but then either "closed" or "slammed" the door. Anderson looked through a glass window, saw Constance retreat toward the master bedroom (rather than go upstairs to fetch WW), and told Trevino, "she [is] going to get back in bed." Trevino testified that she suspected that Constance was not going to get her son.

After approximately four minutes, Constance did not come back to the door, so Anderson instructed Trevino to knock again. Trevino knocked more forcefully this time. Anderson testified that the purpose of this more forceful knock was to "get" Constance's "attention" so that she would "come back." The Officers still did not get a response.

3

No. 21-10159

Trevino notified dispatch that Constance "wasn't coming back to the door" and instructed dispatch to call the Westfall residence. Dispatch called the residence twice. Someone answered the first call, but immediately hung up. The second call was answered by WW, who was told by dispatch to go to the door. Around this time, Corporal Luna ("Luna") had arrived, approached the front door of the residence, and knocked directly onto the glass of the door (instead of the wooden frame). Luna testified that, because of the size of the Westfalls' house, "we do knock a little louder than most." Eventually, WW, another teenage boy, and Monte Westfall ("Monte"), Constance's husband, exited the house. They were later joined by a third boy. It was 44 degrees outside, and Trevino and Anderson began questioning the three minor boys. During the questioning, Trevino and Anderson smelled marijuana from the boys and asked them about the presence of marijuana.

While the officers were questioning the boys, Constance exited her house. Anderson accused Constance of slamming the door in his face and told Trevino that he would not speak to Constance anymore because she "hung up in 911's face." Constance said she did not slam the door, but rather closed it because it was cold outside. She twice asked the officers to come inside, saying that she was legally blind without her glasses and could not see who was "out there," but the officers declined. Eventually, the boys admitted to the officers that there was marijuana in the Westfall residence. Anderson explained to Monte that the officers knew there were illegal drugs in the house and that, with Monte's permission, the officers would go upstairs and confiscate it. Anderson suggested that one of the boys take them to the drugs upstairs. Monte nodded his head in agreement and Constance said, "[WW], you go get it." WW entered the house first, followed by Monte, who was followed by Anderson.

4

No. 21-10159

Anderson testified that, as he approached the door, Constance "abruptly walked at [him] in an aggressive manner at a fast pace." Anderson warned her to not "walk up on" him. Constance responded, "I'll do what I want!" Luna intervened, instructed Constance to get back, and warned her that she would be put in handcuffs if she did not "stop." Trevino and Luna both told Constance that she would be arrested for interfering with police duties and needed to calm down. According to defendants, Constance replied, "You've got to be kidding. I'm the one who said you could go up there."[1] Luna then "brought [Constance] to the ground."

During the few minutes that Constance was pinned, Anderson was in the Westfall residence and retrieved a metal tin containing about 2.5 grams of marijuana from inside of the house. Then, Luna and Trevino handcuffed Constance and placed her in a police car. She was charged with interference with public duties under Texas Penal Code § 38.15, though the charges were ultimately dropped.[2]

Westfall brought various claims under 42 U.S.C. § 1983. The only claim relevant to this appeal is her false arrest claim. In *Westfall I*, our court reversed a grant of summary judgment in favor of the officers and held that the merits of Westfall's false arrest claim depend on whether the officers believed they had valid consent to enter the Westfall residence to confiscate the marijuana. If they did not have valid consent, then they were not performing a duty or exercising authority "imposed or granted by law," so

---

[1] The parties disputed whether Constance said, "I'm the one who said you could go up there" or "I don't want you people to go up there." However, it is not contested on appeal that the jury could have found that she uttered the former statement.

[2] Texas Penal Code § 38.15(a) provides: "A person commits an offense if the person with criminal negligence interrupts, disrupts, impedes, or otherwise interferes with . . . (1) a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law."

No. 21-10159

any interference with their search by Constance could not have violated Texas Penal Law § 38.15. *See Westfall I*, 903 F.3d at 544-46.

On remand, the case was tried before a jury, which returned a verdict for the defendant officers. The district court denied Westfall's motions for judgment as a matter of law and for a new trial. This appeal followed.

## II. Standard of Review

"We review de novo the district court's denial of a motion for judgment as a matter of law, applying the same standards as the district court." *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (citing *Ill. Cent. R.R. Co. v. Guy*, 682 F.3d 381, 392–93 (5th Cir. 2012)). Judgment as a matter of law is proper if "a party has been fully heard on an issue during a jury trial and . . . a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "[W]e view all evidence and draw all reasonable inferences in the light most favorable to the verdict." *Pineda v. United Parcel Service, Inc.*, 360 F.3d 483, 486 (5th Cir. 2004) (citing *Thomas v. Tex. Dept. of Crim. Just.*, 220 F.3d 389, 392 (5th Cir. 2000)). The moving party can prevail only "[i]f the facts and inferences point so strongly and overwhelmingly in favor of the moving party that the reviewing court believes that reasonable jurors could not have arrived at a contrary verdict[.]" *Poliner v. Tex. Health Sys.*, 537 F.3d 368, 376 (5th Cir. 2008) (internal quotation marks omitted) (quoting *Dixon v. Wal-Mart Stores, Inc.*, 330 F.3d 311, 313–14 (5th Cir. 2003)). "After a jury trial, our standard of review is 'especially deferential.'" *Brown v. Suddith*, 675 F.3d 472, 477 (5th Cir. 2012) (quoting *Brown v. Bryan Cnty., Okla.*, 219 F.3d 450, 456 (5th Cir. 2000)).

We review the denial of a motion for a new trial under an "abuse of discretion standard." *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016). "The district court abuses its discretion by denying a new trial only when

No. 21-10159

there is an 'absolute absence of evidence to support the jury's verdict.'" *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 676 (5th Cir. 2016) (internal quotation marks omitted) (quoting *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013)). "If the evidence is legally sufficient, we must find that the district court did not abuse its discretion in denying a motion for new trial." *Id.* (citing *Cobb v. Rowan Cos., Inc.*, 919 F.2d 1089, 1090 (5th Cir. 1991).

### III. Discussion

### A.

Westfall argues that defendants failed to present sufficient evidence to support a finding that Anderson's entry and removal of the tin with marijuana from the house was lawful; thus, she argues, there was insufficient evidence to support the jury's verdict, and the district court erred in denying her motion for judgment as a matter of law. However, Westfall does not dispute on appeal that there was sufficient evidence for a jury to find that the officers obtained voluntary consent from both herself (when she told WW to "go get it") and Monte (when he nodded and went into the house after Anderson requested to go inside to collect the marijuana). Thus, the lawfulness of the officers' search depends on two remaining questions: (1) whether "[t]he officers' knock-and-talk conduct" was "unreasonable," and, if so, (2) whether the subsequent consent obtained from the Westfalls was an "independent act of free will" sufficiently attenuated from an unlawful knock-and-talk. *Westfall I*, 903 F.3d at 545.

"We have recognized the knock-and-talk strategy as 'a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity.'" *Id.* (quoting *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001)). "We have held, however, that 'the purpose of a "knock and talk" is not to create a show of force, nor

7

to make demands on occupants, nor to raid a residence. Instead, the purpose is to make an investigatory inquiry or, if officers reasonably suspect criminal activity, to gain the occupants' consent to search.'" *Id.* (cleaned up) (quoting *United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th Cir. 2007), *overruled on other grounds by Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849, 179 L.Ed.2d 865 (2011)). "When no one answers the door despite knocking, 'officers should end the "knock and talk" and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance.'" *Id.* (cleaned up) (quoting *Gomez-Moreno*, 479 F.3d at 356).

Contrary to Westfall's argument, the lateness of the hour did not render the officers' knock-and-talk unlawful *per se*. Although a 2:15 a.m. knock on one's door will usually transgress background social norms, this case involved a 911 call alleging trespass; the trespassers were believed to be in the Westfall residence; and the officers visually observed youths in a lit room upstairs, indicating that they were not asleep. Under the circumstances, a reasonably respectful officer might have found it necessary to knock on the Westfalls' door, even at this late hour. *See United States v. Staggers,* 961 F.3d 745, 759 (5th Cir. 2020) ("That the officers arrived in the early morning does not necessarily render the knock-and-talk coercive or unreasonable").

Furthermore, during the officers' initial encounter with Constance, Constance nodded in apparent agreement when they asked her to check on her son, but closed the door on them without further discussion and was seen to retreat to her bedroom. Given these mixed signals, it may have been reasonable for the officers to attempt to re-establish contact with her so that they could clarify whether she intended to comply. The situation had not yet ripened into one where Constance made her lack of consent clear, and Constance's nodding could have been interpreted as a tentative license for

the police to remain at the front door.  Arguably, a jury could find that it was reasonable for Trevino to knock a second time, and for the police to place one call into the residence.  *See Gomez-Moreno*, 479 F.3d at 356 (noting that, after awaiting a response to their initial knock at the front door, the officers "might have then knocked on the back door or the door to the back house").  But Trevino's second knock went unanswered, and the first dispatch call to the Westfall residence was hung up on.

Arguably, at that point, the occupants' continued silence "amounted to a refusal . . . to answer the door."  *See United States v. Jerez*, 108 F.3d 684, 691 (7th Cir. 1997).  But even if we were to agree that the officers' further activities—Luna's knocking on the glass pane of the door and dispatch's second call to the Westfall residence—crossed the line from investigative inquiry into an unreasonable knock and talk, it would not entitle Westfall to judgment as a matter of law.  For there remains the question of whether a rational jury could find that Mr. and Ms. Westfalls' subsequent consents were "independent act[s] of free will."  *Westfall I*, 903 F.3d at 545.

To determine whether consent is an "independent act of free will," we consider (1) "[t]he temporal proximity" of the violation, (2) "the presence of intervening circumstances," and (3) "the purpose and flagrancy of the official misconduct."  *Brown v. Illinois*, 422 U.S. 590, 603-604 (1975). This inquiry is analytically distinct from whether the consent was voluntary. *See United States v. Chavez-Villareal*, 3 F.3d 124, 127-28 (5th Cir. 1993). Although *Brown* was not a knock-and-talk case, our precedents have repeatedly cited and applied this three-factor test as authoritative in determining whether a person's statements have been purged of the taint of an unlawful knock-and-talk.  *See United States v. Cooke*, 674 F.3d 491, 496-96 (5th Cir. 2012) (applying "a *Brown* analysis" to determine whether defendant's mother's "consent attenuated any Fourth Amendment violation" following officers' attempt to "conduct a 'knock and talk'");

No. 21-10159

*United States v. Hernandez*, 670 F.3d 616, 621, 623 (5th Cir. 2012) (holding that the district court should have considered "the temporal proximity," "the presence of intervening circumstances," and "the purpose and flagrancy of the official misconduct" to determine whether defendant's "admission was untainted" by "the officers' conduct during their knock-and-talk") (cleaned up) (citing *Brown*, 422 U.S. at 603); *see also Westfall I*, 903 F.3d at 545-46 (citing *Hernandez*'s application of *Brown*'s "three-factor test" and holding that the district court should "consider this argument . . . on remand" to determine "whether Westfall's alleged consent [after the knock-and-talk] was an independent act of free will").

After instructing the jury on the three *Brown* factors, the district court further charged the jury:

> You may consider situations such as when the officers are rude; the officers are accusatory; the officers make demands rather than requests such as by their tone of voice, volume, and authoritative manner; the officers threaten or yell; the officers keep individuals exposed to the cold; the officers threaten to get a warrant and detain the residents outside all night while a warrant is obtained; and the officers merely demonstrate their dominance over the individuals.

The court also properly instructed the jury that the burden was on the officers to prove that the consent they obtained was an independent act of free will. Westfall does not argue on appeal that these instructions misstated the law or were otherwise prejudicial.

As to the first *Brown* factor, it is undisputed that the consents granted by Mr. and Ms. Westfall were close in time to the knock-and-talk. But this factor alone is not "determinative." *United States v. Macias*, 658 F.3d 509, 523 (5th Cir. 2011).

10

The second factor presents a trickier question. We have indicated that where there is no evidence of coercive police tactics, and the person from whom consent is sought is adequately informed of the right to refuse consent, these factors constitute intervening circumstances sufficient to purge the taint of an unreasonable detention. *United States v. Kelley*, 981 F.2d 1464, 1471-72 (5th Cir. 1993). But we have also distinguished *Kelley* where the officer had already "made known his suspicions about narcotics," for in such cases it might appear to the consenting party that refusal would be "pointless." *Chavez-Villareal*, 3 F.3d at 128. Such was the case here; Anderson arguably informed Monte of his right to deny consent by requesting entry "with your permission," but only after he made known to the Westfalls that the officers knew there were illegal drugs inside. Nevertheless, we cannot say that this precluded the jury as a matter of law from finding intervening circumstances. As we stated in *United States v. Richard*, 994 F.2d 244 (5th Cir. 1993), *abrogated on other grounds by United States v. Aguirre*, 664 F.3d 606 (5th Cir. 2011), this determination depends, to an extent, on the "atmosphere" of the interaction between the officers and the consenting party. *Richard*, 994 F.2d at 252. There, we cited the Tenth Circuit's holding in *United States v. Mendoza-Salgado*, 964 F.2d 993, 1013 (10th Cir. 1992), in which the Court held that a woman who was present when her husband was arrested had validly consented to a search of her home "after a short time had passed and all had calmed down." *Richard*, 994 F.2d at 252; *see Mendoza-Salgado*, 964 F.2d at 1000 (agents testified the wife "appeared 'calm, quiet, observing, listening, friendly and cooperative,' insisted she knew nothing about cocaine and said, 'go ahead and search'") (brackets omitted). In the present case, there is at least some evidence of a changed atmosphere: the knocks and calls had undisputedly ended; Constance corrected the officers when they alleged she "slammed" the door; and Constance, unprompted, twice invited the officers to come inside (which

they initially declined to do). While these few lines of dialogue might not be sufficient on their own to show a sufficient cooling of temperatures to purge the taint of an unlawful seizure, *cf. Mendoza-Salgado*, 964 F.2d at 1000, 1012-13, we note as well that the jury was in the best position to assess the overall rapport between the officers and the Westfalls, having listened to audio recordings of their exchanges (which are not in the record on appeal). As just noted, the jury was instructed to consider such factors as whether the officers were "rude," their "tone of voice," and whether they "threaten[ed] or yell[ed]." Because we are limited to a cold transcript, we are reluctant to place our own impression of the encounter above what the jury might have perceived.

As to the third factor, a rational jury could have found that the officers' conduct, even if it potentially amounted to an unlawful knock-and-talk, was not flagrant. As we reaffirmed in *Cooke*—another knock-and-talk case—the flagrancy (or lack thereof) of the violation is the "most important" factor. 674 F.3d at 496. *Cooke* held that because (1) "the purpose of [the officers' entry] was to conduct a 'knock and talk' (a common and legitimate police practice)," (2) the curtilage of the defendant's residence was "difficult and nuanced," and (3) the police did not "use coercive or deceptive tactics . . . or fail to adequately inform [the consenting party] of her rights," the officers' arguable intrusion on the defendant's curtilage was "technical at best and certainly not flagrant." *Id.* at 496, *see id.* at 492-93. Thus, the Court, applying a "*Brown* analysis," held that the consent the officers received "attenuated any alleged Fourth Amendment violation" flowing from the "'knock and talk.'" *Id.* at 495-96.

Similarly, a jury could find that the officers' conduct here did not rise to the level of flagrant misconduct. As noted above, a jury could at least find that the officers had initial license to knock on the Westfalls' door in response to a trespassing complaint. And, viewing the facts in the light most favorable

to the verdict, Constance's assent when asked to "check" on WW indicated that the officers possessed some license to remain at her front door, wait for her return, and, when she did not do so, attempt to re-establish contact in a limited and respectful manner. The line was crossed, if at all, *after* Constance failed to come back to the door, and only by the cumulative effect of Trevino's and Luna's further knocking and the dispatching of two calls into the Westfall residence. Regardless of whether all, some, or none of these further acts were lawful, a jury could find that they were neither significant nor willful intrusions. Identifying the exact point at which the officers should have given up and retreated is "difficult and nuanced," as in *Cooke*, 674 F.3d at 496. Moreover, there was no physical restraint of the Westfalls during the knock-and-talk or at the time consent was given; at least some of the house's occupants were already awake during and immediately prior to the knock-and-talk; and the officers neither used nor threatened violence to rouse the Westfall family from their home. *Cf. Hernandez*, 670 F.3d at 618, 623 (finding knock-and-talk was "egregious," under *Brown* analysis, where officers "had their weapons drawn" and "one of the officers broke the glass pane of the screen door with a baton"). With regard to the volume of the officers' knocking, a jury could have credited Luna's testimony that it was necessitated by the size of the Westfalls' home. It is also significant that Luna knocked on the Westfalls' door unprompted by the other officers, and that when he did so he may not have been fully aware of their prior efforts to reach the house's occupants.

Weighing the three factors, the jury could therefore have concluded that Mr. and Ms. Westfalls' consents were independent acts of free will. In coming to this determination, we cannot overemphasize the importance of our standard of review. As long as "there is more than a scintilla of evidence to support the jury's verdict," the verdict must stand. *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 609 (5th Cir. 2007).

Westfall has not shown that the verdict was so lacking in evidentiary support as to entitle her to judgment as a matter of law.

**B.**

Westfall argues separately that the district court violated the mandate rule. "The mandate rule requires a district court on remand to effect [this Court's] mandate and to do nothing else." *Gen. Univ. Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 453 (5th Cir. 2007) (internal quotation marks omitted) (quoting *United States v. Castillo*, 179 F.3d 321, 329 (5th Cir. 1999), *rev'd on other grounds by Castillo v. United States*, 530 U.S. 120 (2000)).

The basis for Westfall's mandate-rule argument is that the district court (1) allowed the officers to testify that their conduct was not a "knock and talk" and instead recharacterize it as an "active investigation," and (2) allowed defense counsel to repeat this argument to the jury at summation. Westfall notes that upon receipt of a jury note asking for clarification of the law governing an "active investigation," the district court referred the jury back to their original instructions.

Notwithstanding Westfall's attempt to shoehorn her argument into the "mandate rule," we review it for what it is: a basic evidentiary objection to the testimony and arguments the defense was allowed to make to the jury. "[W]e reverse judgments for improper evidentiary rulings only when a challenged ruling affects a party's substantial rights." *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 687 (5th Cir. 2003); *see also Bufford v. Rowan Co., Inc.*, 994 F.2d 155, 157 n.1 (5th Cir. 1993) ("Improper comments from the bench or by counsel will not warrant a reversal unless they so permeate the proceedings that they impair substantial rights and cast doubt on the jury's verdict."); *Longoria by Longoria v. Wilson*, 730 F.2d 300, 305 (5th Cir. 1984).

Westfall argues that, because the evidence cannot support a defense verdict, the jury must have been misled by the improper evidence and

argument.   But as we have already noted above, the properly-admitted evidence could support a defense verdict, so this argument is unavailing.

Moreover, Westfall does not dispute that the jury charge accurately stated the law and that further confusion (if any) could have been cleared up with an additional instruction.  As the record makes clear, the district court gave counsel an opportunity to request such an instruction when it received the jury note asking about "active investigation[s]."   Asked by the court whether it should "tell the jury that they have all of the information that they need in the jury charge and the evidence that has been presented to them," Westfall's counsel initially said, "yes."   Counsel then stated that the court "could potentially address" the "active investigation" issue, but did not specifically request such an instruction or object when the court referred the jury to the original charge.  *See Russell v. Plano Bank & Trust*, 130 F.3d 715, 720 n.2 (5th Cir. 1997) (noting that Federal Rule of Civil Procedure 51 requires a party to "make a formal, on-the-record objection" and "state clearly the grounds for their objection").  Therefore, any argument that the district court's curative efforts were inadequate in this case must fail.  *See Maldonado v. Missouri Pacific Ry. Co.*, 798 F.2d 764, 771 (5th Cir. 1986) ("By acquiescing in the court's corrective charge, defendant got a chance to see the verdict and then seek to overturn it.  Because of the district court's curative instructions, and because defendant chose to gamble on the verdict, we find that the district court correctly denied defendant's motion for new trial") (internal quotation marks and citation omitted).

## IV. Conclusion

For these reasons, we AFFIRM.